#24986-a-DG

**2010 SD 72**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

FARRELL DILLON,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JANINE M. KERN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

SHERRI SUNDEM WALD
Deputy Attorney General
MEGHAN N. DILGES
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.

TIMOTHY J. RENSCH
Rensch Law Office
Rapid City, South Dakota                          Attorneys for defendant
                                              and appellant.

* * * *

ARGUED MAY 25, 2010

OPINION FILED **08/25/10**

#24986

GILBERTSON, Chief Justice

[¶1.]        Defendant was retried on two counts of first degree rape and three counts of criminal pedophilia for sexual crimes against his daughter and her four friends after his 1999 conviction was overturned on habeas review.  Defendant was found guilty by a jury and sentenced by the trial court to 125 years in the state penitentiary.  Defendant argues the trial court erred when it denied his motion for acquittal for the first degree rape charges concerning his daughter, K.D., because she recanted during cross-examination.  He argues the trial court also erred when it did not grant his motion for mistrial after the State's psychiatric expert vouched for the victims, and in the alternative because of a display of children's shoes that was briefly within the jury's view while walking from the courtroom to the jury room.  Defendant also argues his right to Due Process was violated when the trial court refused to admit into evidence cards and letters he wrote to K.D. after the charges were filed.  Finally, Defendant argues the trial court erred when it did not grant his motion for retrial after it was discovered that the jury obtained and discussed extrinsic information.  We affirm on all issues.

**FACTS**

[¶2.]        An overview of the factual history of this case is set forth in *State v. Dillon,* 2001 SD 97, 632 NW2d 37 (hereinafter *Dillon I*).  A condensed version of those facts pertinent to the present appeal is presented below.

[¶3.]        On December 9, 1998, Farrell Dillon (Defendant), age forty at that time, was charged with seven counts of first degree rape, two counts of third degree rape, and five counts of criminal pedophilia based on the allegations of five child

-1-

victims for the events of July 10, 1998, and September 11, 1998. The victims included K.D., Defendant's then seven-year-old daughter, and four of K.D.'s girlfriends: seven-year-old L.R., eight-year-old N.R., eight-year-old S.R.B., and eight-year-old T.T. The two counts of third degree rape were removed from an amended information filed on August 17, 1999. In 1999, Defendant was tried on the remaining twelve counts and was convicted on seven counts of first degree rape and five counts of criminal pedophilia. He was acquitted on an additional charge involving sexual contact with T.T. and two other charges involving L.R. for the events of July 10, 1998.[1] Defendant was sentenced to 175 years in the State Penitentiary.

[¶4.]     On appeal, this Court vacated three of the first degree rape convictions based on the double jeopardy prohibition because the same acts of penetration were used to support separate counts of first degree rape and counts of criminal pedophilia. *Dillon I*, 2001 SD 97, ¶22, 632 NW2d at 46. On remand, the trial court sentenced Defendant to 115 years on the remaining convictions. Defendant's subsequent state habeas corpus action alleging ineffective assistance of counsel was denied by the trial court, but reversed by this Court. Dillon v. Weber, 2007 SD 81, 737 NW2d 420.

[¶5.]     The State gave timely notice of its intention to retry Defendant and filed an Information with the following counts:

        Count 1     First Degree Rape     K.D.     July 10, 1998

---

1.    L.R. was unavailable to testify at the 1998 trial because of post traumatic stress disorder. However, L.R. testified at the second trial in 2008.

| | | | |
|---|---|---|---|
| Count 2 | First Degree Rape | K.D. | September 11, 1998 |
| Count 3 | Criminal Pedophilia | S.R.B. | July 10, 1998 |
| Count 4 | Criminal Pedophilia | L.R. | September 11, 1998 |
| Count 5 | Criminal Pedophilia | N.R. | September 11, 1998[2] |

In a pretrial motion in limine, Defendant asked for preclusion of any reference to the previous trial, sentencing, direct appeal, and habeas proceedings under SDCL 19-12-3 (Rule 403) without specifying what portion of the rule pertained to his motion.[3] The State did not resist the motion, which was granted in its entirety by the trial court.

[¶6.] As previously noted, the facts from the first trial are detailed in *Dillon I*, 2001 SD 97, ¶¶2-10, 632 NW2d at 41-42. In May 2008 at the second trial, the State called Dr. Leslie Fiferman, a clinical psychologist who had worked with between 2,000 and 3,000 sexual abuse victims over twenty years of practice in the military and as a private practitioner. Dr. Fiferman testified that he had no contact with any of the victims, nor had he read any of the police reports in this case. He was asked to testify generally about the characteristics of sexual abuse victims and their ability to recall and recount their abuse experiences. Dr. Fiferman testified that most sexual abuse victims suffer from post traumatic stress disorder as a

---

2. The State also filed two additional counts of criminal pedophilia for the conduct against L.R. on July 10, 1998, and against T.T. on July 10, 1998. However, these charges were dismissed on motion by Defendant as he was acquitted of those charges during the first trial.

3. SDCL 19-12-3 (Rule 403) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

consequence of their experiences.  He also testified that victims can experience emotional regression as a consequence.  Dr. Fiferman further testified that it is common for victims to dissociate themselves from the experience as a self-defense mechanism; dissociated victims' minds can fail to capture the details of the events that transpired, or may only store a portion of the events.  He also gave background on the dynamics of "grooming" of sexual abuse victims by a perpetrator, including the shame and self-blame that a victim experiences as a consequence.  As a final characteristic, the following exchange occurred on direct examination:

> Q.  I just have one final area to discuss with you, and that –
> and it's kind of maybe combined in what you've testified
> to so it could be brief.  But just in a short synopsis, you've
> seen certain behaviors of children that – have you seen
> certain behaviors that would tell you that – potentially
> lend credibility to the fact that kids have had this occur to
> them?
>
> A.  Yes.
>
> Q.  Okay.  Have you testified to those with this jury?
>
> A.  With this jury today, I believe I have.  I missed out
> probably one of the most important ones, and that is that
> *when somebody reports being sexually abused, in the*
> *majority of cases, that's the truth.*  That's the one.

(Emphasis added).  Defendant moved for a mistrial contending that Dr. Fiferman's testimony invaded the province of the jury.  A brief hearing was held on the motion outside the presence of the jury.  Defendant's motion for mistrial was denied.

[¶7.]     Defendant was able, however, to object in the jury's presence to the last statement in Dr. Fiferman's testimony as being without foundation and beyond the scope of Dr. Fiferman's expertise.  The trial court sustained the objection and instructed the jury to disregard that portion of his testimony.  The trial court

further instructed that at the conclusion of the case the jury, as the exclusive trier of fact, would determine from all the evidence, excluding Dr. Fiferman's last statement, the veracity of each witness.

[¶8.] The State then called the victims, beginning with K.D., to testify to the events of July 10, 1998, and September 11, 1998. After K.D. testified, the recordings of her prior interviews with police were played for the jury. After each victim testified live, the relevant interviews for each witness were played for the jury. Based on the physical appearance of the victims and the ages each gave on the videotapes versus on the witness stand, it became obvious to the jury that the allegations happened approximately ten years prior to trial.

[¶9.] During K.D.'s direct testimony in 2008, she testified that on the night of her birthday party, Defendant tried to lick her "private parts," however K.D. closed her legs. K.D. testified that she could not remember what her father did next. When asked if her father tried to touch K.D. in any other sexual manner that night, K.D. replied "I don't remember." On cross-examination K.D. testified as follows:

> Q. Ma'am, is it your position here today that your father did more than touch your vagina with his penis?
>
> A. What do you mean?
>
> Q. Okay. What did your father do with his penis to your vagina?
>
> A. He didn't do anything with his penis with my vagina.
>
> . . .
>
> Q. Okay. His penis did not go in your vagina?
>
> A. Yes.

> Q.  And that's what you told Detective Fox long ago, correct?
>
> A.  Yeah.
>
> Q.  Okay.  So there was never a point in time when your father's penis went inside your vagina; is that correct?
>
> A.  Yeah.

[¶10.]  The other victims testified with some discrepancies between their prior testimony and police interviews concerning the details of whether the molestations happened in Defendant's bedroom, or K.D.'s bedroom, and the details of who removed their clothing.  However, each victim was able to articulate the acts that were perpetrated by Defendant upon the girls.

[¶11.]  On the third day of trial, Detective Fox testified.  Following her live testimony, the jury heard a portion of the audiotaped interview of K.D. with Detective Fox and Horan, a Department of Social Services (DSS) employee.  After hearing a portion of the tape, the trial court recessed the jury for a few minutes.  After the jury left the courtroom, the jurors walked through a hallway and into the jury room.  The trial judge soon followed that same hallway to reach judge's chambers and discovered a display of children's shoes, including shoes for both girls and boys, in the hallway traveled by the jury.  The trial judge asked the bailiff to remove the display and then determine the source and purpose of the shoes.  It was determined that the display was part of a CASA presentation being held in the courthouse.[4]  Neither the trial judge, bailiff, nor the State were aware of the display

---

4.  The Court Appointed Special Advocates (CASA) for Children program provides volunteers who are appointed by judges to advocate for abused and neglected children in the legal system until a safe and permanent home is

(continued . . .)

or had a role in its placement.[5]  The trial court brought the shoe display to the attention of the parties after the lunch break and explained the context.  The trial court explained the admonishment it was planning to give to the jury:

> After the recess during the testimony of Sue Fox, when you left the courtroom and traveled down the hallway, you traveled past several sets of children's shoes that were placed there without the Court or the bailiffs' knowledge by the CASA program as a demonstration for a presentation they were giving.  They should not have been placed in the area where you would walk.  You must disregard their presence and must not allow this to have any effect upon you in any fashion as you consider this case.

Defendant moved for a mistrial; the State resisted.  The trial court denied Defendant's motion.

[¶12.]     During the defense portion of the trial, Defendant testified on his own behalf.  During his direct examination, Defendant offered as exhibits letters and holiday cards he wrote to his daughter, K.D., after the allegations were first made and she was removed from his care by DSS.  Defendant argued that the letters and cards corroborated his in-court testimony.  The writings contained statements to the effect that Defendant loved K.D. and that he was fighting to get her back.  Defendant offered them to show his state of mind and not for the truth of the matter asserted.  Defendant claimed the writings were exculpatory in nature and supported his theory of defense.  The State objected on the basis that the writings

_____

(. . . continued)

found in foster care or a group home. http://www.casaforchildren.org/site/c.mtJSJ7MPIsE/b.5301303/k.3DEC/The_CASA_Story__CASA_for_Children.htm (last visited August 13, 2010).

5.     The State's Attorney and Defendant's counsel did not personally see the display before it was removed by the bailiffs.

were hearsay, irrelevant, and self-serving. The trial court sustained the State's objection on the basis that the writings were hearsay.

[¶13.]       The jury deliberated for five to six hours before returning a verdict of guilty. On July 7, 2008, Defendant filed a Motion for New Trial based on juror misconduct that introduced extrinsic information into the jury room during deliberations. Defendant alleged that the following information was brought into the jury room (1) that Defendant had been in prison for the ten years preceding the trial, (2) that another trial had taken place ten years earlier and that a new trial had been granted because Defendant received incompetent legal representation during the 1999 trial.

[¶14.]       Eleven of the jurors submitted affidavits for the trial court's consideration. However, all references to intrinsic information as to how the comments affected the jurors were stricken and not considered by the trial court. A hearing on the motion was held at which all twelve jurors testified.

[¶15.]       Juror "C" testified that before deliberations started a male juror had entered the jury room and exclaimed in a loud voice something to the effect "you know why it's been ten years don't you? It's because he's been in the pen." Juror "C" testified he could not recall the male juror's name, but that he was employed as a truck dispatcher.

[¶16.]       Juror "N" was identified as the male juror employed as a truck dispatcher. Juror "N" testified at the hearing that he did not hear any discussion by the jury that Defendant had been in prison for ten years prior to the trial. He also testified that he did not hear any comments that a second trial was required due to

the incompetent representation of Defendant's first trial attorney. On cross-examination, Juror "N" was asked if he had made the statements. He replied "No." He was then asked "Did you know that he had been in prison or jail for ten years during the course of the deliberations?" Juror "N" again testified "No."

[¶17.] Juror "M" testified she signed an affidavit stating she remembered someone making the statement that Defendant's first trial attorney had been incompetent. It was not until a few weeks after she signed her affidavit that Juror "M" remembered that she was the source of the information. Juror "M" testified that she obtained the information while out in public when she was scheduling an appointment and made the statement that she could not attend a specific date and time due to jury duty. The woman to whom Juror "M" was speaking asked if Juror "M" was serving on the Dillon trial. Juror "M" did not respond to the inquiry, but before she could leave the conversation the woman with whom she was speaking stated that "he had an incompetent attorney." Juror "M" did not respond. At the hearing, Juror "M" could not recall the woman's name or where the conversation had taken place. Juror "M," however, recalled she told her fellow jurors of the incompetent 1999 trial attorney at the point in time when the jurors were trying to establish why it had taken ten years for the matter to come to trial.

[¶18.] The trial court heard all the testimony, reviewed affidavits, briefs, and heard oral arguments on the motion. It found that extrinsic information had come into the jury room via Juror "M" and was heard to some degree by seven of the jurors. Four of the jurors heard little if anything. The trial court also found the information was mentioned very briefly and not given extensive consideration by

the jury. It did not make a specific finding regarding the testimony from Juror "C" that a male juror employed as a truck dispatcher had loudly proclaimed that Defendant had been in prison for ten years.

[¶19.] The trial court concluded that the misconduct was not prejudicial because there was substantial evidence of guilt introduced during the five-day trial. It further concluded there was no significant possibility that Defendant was prejudiced in light of the jury instructions, the testimony of the jurors, and the admitted portions of the jurors' affidavits. The trial court denied Defendant's motion for a new trial.

[¶20.] Defendant was subsequently sentenced to twenty five years on each count to be served consecutively for a total of 125 years. Defendant appeals raising the following issues:

1. Whether the trial court erred in denying Defendant's Motion for Judgment of Acquittal, when K.D. denied Defendant's penis went inside her vagina.

2. Whether the trial court erred in refusing to grant a mistrial after the State's psychiatric expert, when giving testimony about characteristics of child sexual abuse victims, testified that when a report of sexual abuse occurs in a majority of cases the victim is being truthful.

3. Whether the trial court erred in refusing to grant a mistrial when the jury walked through a hallway containing a CASA sponsored display of children's shoes that was unrelated to the trial.

4. Whether the trial court violated Defendant's right to due process and a fair trial when it denied admission of letters and cards written by Defendant to his daughter that corroborated his testimony.

5. Whether the trial court abused its discretion in refusing to grant a new trial, when it was alleged jurors brought extrinsic information into the jury room that Defendant had been in prison for the past

ten years and that he had secured a new trial due to the incompetent representation provided by his 1999 trial attorney.

**ANALYSIS AND DECISION**

[¶21.]     **1.     Whether the trial court erred in denying Defendant's Motion for Judgment of Acquittal, when K.D. denied Defendant's penis went inside her vagina.**

[¶22.]     Defendant argues on appeal that his convictions on two counts of rape, Count 1 and Count 2, involving K.D. must be reversed on appeal because K.D. recanted on the stand when she testified on cross-examination that Defendant's penis did not go inside her vagina.[6] However, the State points to the substantial testimony in the record by K.D. that Defendant touched her vaginal area with his penis, which included her two videotaped interviews with Detective Fox and Horan a few weeks after the General Beadle School party incident on September 11, 1998. Horan also testified that K.D. told her after the second interview that Defendant had touched her and "it hurt." As has been factually set forth in *Dillon I*, there was substantial evidence from the other victims as to the penetration of K.D. Finally, Dr. Strong, the physician who examined K.D., testified that K.D. told him that her father had hurt her in her private area.

---

6.     The question about vaginal entry does not comport with our statutory definition of penetration. SDCL 22-22-2 defines "penetration" as "an act, however slight of sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." We have held that when the State presents evidence of vulval or labial penetration, however slight, this act, if believed by the jury to have occurred, is sufficient to establish penetration of the genital opening. State v. Packed, 2007 SD 75, ¶32, 736 NW2d 851, 861.

[¶23.]    A trial court's denial of a motion for judgment of acquittal presents a question of law for review under the de novo standard. State v. Packed, 2007 SD 75, ¶17, 736 NW2d 851, 856 (quoting State v. Disanto, 2004 SD 112, ¶14, 688 NW2d 201, 206). The relevant question is whether the "evidence was sufficient to sustain the convictions." State v. Adamson, 2007 SD 99, ¶17, 738 NW2d 919, 924 (quoting State v. Running Bird, 2002 SD 86, ¶19, 649 NW2d 609, 613). We consider the evidence in a light most favorable to the verdict when considering the sufficiency of the evidence on appeal. Id. We will not set aside a guilty verdict on appeal "if the State's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt. We do not resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of an explanation, or weigh the evidence." Id.

[¶24.]    Citing Parsons v. Dacy, 502 NW2d 108 (SD 1993), Defendant argues that the State's case cannot rise above K.D's testimony. That misconstrues our rule. We have held that a party to an action cannot claim a better version of the facts than to which the party testified. Id. at 111. However, here K.D. was not the party in opposition to the Defendant, the State was.

[¶25.]    There was sufficient evidence in the record to support the rape allegation as to some degree of penetration. Thus, the trial court did not err when it denied Defendant's motion for judgment of acquittal.

[¶26.]    **2.    Whether the trial court erred in refusing to grant a mistrial after the State's psychiatric expert, when giving testimony about characteristics of child sexual abuse victims, testified that when a report of sexual abuse occurs in a majority of cases the victim is being truthful.**

[¶27.]     Defendant next argues it was error for the trial court to deny his motion for mistrial after Dr. Fiferman's testimony concerning the general characteristics of a sexually abused victim, which included the statement "when somebody reports being sexually abused, in the majority of cases, that's the truth." Defendant argues on appeal that this was improper vouching and bolstering of the child victims' testimony. The State argues that Dr. Fiferman's testimony did not invade the province of the jury because it was a generalized explanation of a sexually abused child's capacity to testify and was not improper vouching or bolstering. Even if it were improper vouching or bolstering, the State further argues that Defendant is unable to show prejudice because of the limiting instruction given by the trial court.

[¶28.]     We review the denial of a motion for mistrial under the abuse of discretion standard. State v. Fool Bull, 2009 SD 36, ¶34, 766 NW2d 159, 167 (citing State v. Fool Bull, 2008 SD 11, ¶10, 745 NW2d 380, 385)). We will affirm a trial court's denial of a mistrial unless we find abuse of discretion resulting in clear prejudice. *Id.* "Error is prejudicial when, in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it." *Id.* (quoting *Fool Bull*, 2008 SD 11, ¶10, 745 NW2d at 385). We also use the abuse of discretion standard to review the trial court's evidentiary rulings. State v. Goodroad, 1997 SD 46, ¶8, 563 NW2d 126, 129 (citing State v. Oster, 495 NW2d 305, 309 (SD 1993)). "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." State v. Henry, 1996 SD 108, ¶10, 554 NW2d 472, 473 (quoting State v. Moriarty, 501 NW2d 352, 355 (SD 1993)).

However, we also presume that juries understand and abide by curative instructions. State v. Maves, 358 NW2d 805, 809 (SD 1984) (citing State v. No Heart, 353 NW2d 43 (SD 1984); State v. Reddington, 80 SD 390, 125 NW2d 58 (1963)).

[¶29.]    In the case at bar, Dr. Fiferman testified about the characteristics of sexually abused adults and children.  Defendant objected and the trial court admonished the jury to disregard the statement in question.  We presume the jury followed the instructions as given and disregarded Dr. Fiferman's one-line statement regarding the truthfulness of a majority of sexual abuse claims.  *See id*.  The trial court did not abuse its discretion when it gave the curative instruction rather than granting Defendant's motion for mistrial.

[¶30.]    **3.    Whether the trial court erred in refusing to grant a mistrial when the jury walked through a hallway containing a CASA sponsored display of children's shoes that was unrelated to the trial**.

[¶31.]    Defendant argues that the CASA display of children's shoes in the hallway through which the jury passed, along with the other claimed errors, warrants retrial.  Without citing any specific authority, Defendant argues that the shoe display in all probability produced some effect upon the jury's verdict.  Defendant argues that "baby shoes" in the hallway combined with Dr. Fiferman's testimony could have changed the outcome of the entire proceeding.  The State argues that the trial court's denial of Defendant's motion for mistrial was within its discretion and that Defendant is unable to show prejudice.  It also argues Defendant is unable to support this argument given the lack of error in admitting

#24986

Dr. Fiferman's testimony and the trial court's admonishment to the jury to disregard the shoe display.

[¶32.]     As noted above, the standard of review for a mistrial is abuse of discretion. *Supra* ¶28. This Court will affirm the trial court's denial of a motion for mistrial unless we find abuse of discretion resulting in clear prejudice. *Fool Bull*, 2009 SD 36, ¶33, 766 NW2d at 167. As this Court has noted before in the context of a denial for a motion for change of venue, a "[d]efendant is entitled to a trial by an impartial jury. Art VI, § 7, SDConst. Not only should the minds of the jurors be without bias or prejudice, but they should be removed from the bias, prejudice and excitement of others." State v. Belt, 79 SD 324, 328, 111 NW2d 588, 590 (1961) (citing State v. Demerly, 56 SD 65, 227 NW 463 (1929); State v. Meservey, 53 SD 60, 220 NW 139 (1928)).

[¶33.]     Defendant argues the children's shoe display biased or prejudiced the jury in some manner by eliciting sympathy and emotions for the victims. However, the display was not symbolic of child sexual abuse, or specific to female victims. The display contained the shoes of both girls and boys and was not tied to the trial in any manner. Furthermore, Defendant does not point to any of the jurors as having children or connecting to the symbolism, only to his own emotional connection to the shoes of his children.

[¶34.]     The shoe display did not encourage or display a message that Defendant should be found guilty. Lacking any inflammatory message specific to Defendant's trial, the display was not inherently prejudicial. *See* People v. Pendelton, 185 IllApp3d 768, 774, 542 NE2d 386, 389-390 (IllAppCt 1989) (holding

-15-

the word "guilty" written on the inside locker of a men's restroom used by eight of the jurors during deliberations did not contain a reference to Pendelton and was not inflammatory as was the case in *People v. Jones*, 105 Ill2d 342, 475 NE2d 832, 837 (1985), where black racist literature was found in the jury room during the deliberations of an all white jury in the criminal trial of a black defendant and three jurors admitted to reading the material). Finally, any effect upon the jury was addressed by the trial court when it admonished the jury that the display was a CASA event wholly unconnected to the trial and was to be disregarded and not considered in any fashion for purposes of Defendant's case.

[¶35.] **4. Whether the trial court violated Defendant's right to due process and a fair trial when it denied admission of letters and cards written by Defendant to his daughter that corroborated his testimony.**

[¶36.] Defendant argues the trial court erred when it refused to admit into evidence the letters and cards he wrote and sent in 1998 to K.D. through DSS. He argues the writings were offered under SDCL 19-16-7 (Rule 803(3)) to show Defendant's state of mind that he loved his daughter and wanted to regain custody of K.D. and not for the truth of the matter asserted. Defendant also argues that the writings were exculpatory evidence that supported his theory of defense. The refusal of the writings, Defendant argues, prevented him from fully defending his case. The State argues that the writings were not relevant to the facts in issue because they would not assist the jury in determining if Defendant had sexual contact with K.D. or her friends on the nights in question. The State also argues the writings were hearsay under SDCL 19-16-1(3) (Rule 801(c)) and were being offered to prove the truth of the matter asserted.

[¶37.]     The standard of review for evidentiary decisions made by the trial court is abuse of discretion. *Supra* ¶28. A misapplication of the rules of evidence is by definition an abuse of discretion. State v. Guthrie, 2001 SD 61, ¶30, 627 NW2d 401, 415 (citing Koon v. United States, 518 US 81, 100, 116 SCt 2035, 2047, 135 LEd2d 392 (1996)). A trial court does not abuse its discretion when it merely allows or refuses questionable evidence. *Id.*

[¶38.]     The trial court ruled the writings were hearsay within the meaning of SDCL 19-16-1(3) (Rule 801(c)), which provides: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible except as provided by law or by chapters 19-9 to 19-18, inclusive, or by other rules prescribed by the Supreme Court." SDCL 19-16-4 (Rule 802).

[¶39.]     Defendant argues that the writings were not offered for the truth of the matter asserted, but rather to show his state of mind under SDCL 19-16-7 (Rule 803(3)) at the time the letters and cards were written. However, Defendant also concedes that the purpose of the writings was to "show what he said at the time so the jury could decide for themselves if these sentiments of love and fatherly advice contained in the cards and letters corroborated his defense." In essence, Defendant concedes in his brief that the writings were being offered to prove the truth of the matter asserted in the letters and cards, that Defendant loved and cared for his daughter despite the accusations. The letters and cards contain statements to that effect, that Defendant loved K.D., did not abandon her, and he was working to regain custody.

[¶40.]     Even if the writings were being offered for a proper evidentiary purpose, the statements therein do not meet the requirements for admission under the state of mind hearsay exception in SDCL 19-16-7 (Rule 803(3)).  Under the state of mind rule, "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health[ ]" is not hearsay.  SDCL 19-16-7 (Rule 803(3)).  The party seeking admission must show:  (1) the statements are contemporaneous with the mental state sought to be proven; (2) there exists no circumstances suggesting a motive for the declarant to fabricate or misrepresent his thoughts; and (3) the declarant's state of mind must be relevant to the issues of the case.  5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 803.05[2][a] (2d ed. 2002).

[¶41.]     In this case, the conditions for admission of the state-of-mind evidence were not satisfied.  These written statements were made by Defendant with the awareness that DSS case workers would read them prior to the cards being forwarded to K.D.  As such, that knowledge suggests a motive for Defendant to misrepresent his thoughts.

[¶42.]     Finally, Defendant's statements were not relevant to the issues in the case.  Defendant's state of mind after his arrest was not relevant to the charges of rape and sexual contact with a minor.  *See* United States v. Wilder, 597 F3d 936, 942 (8thCir 2010) (holding a defendant's state of mind after his arrest and while seated in a police car were not relevant to the charges related to conspiracy to distribute cocaine); United States v. Udey, 748 F2d 1231, 1243 (8thCir 1984)

(holding evidence of defendant's state of mind or emotion on June 5, 1983, were not relevant to the charges which concerned the events of June 3, 1983).

[¶43.] Defendant's contention that he was denied due process when the letters were not admitted also fails. Defendant was able to testify to the same sentiments and feelings while on the witness stand as those presented in the writings. He was also able to present his theory of his defense that Defendant was a good father, that the victims were not truthful, and that the police and forensic interviews tainted the victims' testimony. The trial court's refusal of the writing did not impede Defendant's ability to argue his theory of defense.

[¶44.] **5. Whether the trial court abused its discretion in refusing to grant a new trial, when it was alleged jurors brought extrinsic information into the jury room that Defendant had been in prison for the past ten years and that he had secured a new trial due to the incompetent representation provided by his 1999 trial attorney.**

[¶45.] Defendant's final issue on appeal is that the trial court erred when it denied his motion for new trial based on juror misconduct. The trial court found that extrinsic information was brought into the jury room by Juror "M" who commented that a second trial had been required after Defendant's first attorney had been determined incompetent. The trial court also entered a finding that at least one juror heard a comment made by another juror that Defendant had been in prison for the ten years prior to the second trial. It did so without identifying the specific juror alleged to have made the comment about Defendant's ten years in prison. The trial court also entered a finding that prejudice was presumed due to the introduction of extrinsic information. The trial court applied the first and

second tests in *State v. Wilkins*, 536 NW2d 97 (SD 1995), and concluded that the State overcame the rebuttable presumption of prejudice.

[¶46.]      Defendant argues that the introduction of extrinsic information that he had been in prison for ten years prior to trial and that a retrial was granted due to the incompetent representation of his 1999 trial attorney prejudiced his right to a fair and impartial jury.  He further argues the trial court erred when it failed to make a specific finding as to the male juror's alleged comment that Defendant had been in prison for ten years prior to trial.  Defendant also argues the trial court erred when it did not use the objective standard from *Wilkins*, 536 NW2d at 100, to ascertain "the likelihood that the influence would have upon a typical juror."

[¶47.]      The State argues that the fact the jury became aware of the reason for the prior trial cannot support a finding of prejudice because the trial court specifically instructed the jury to disregard that information in rendering its verdict.  It further argues that the jury became aware of the 1999 trial during the 2008 trial when references were made to the prior testimony of witnesses.  As such, the State argues the fact a prior trial was held was not extrinsic information as the fact of a prior trial was made known to the jury through in-court testimony.

[¶48.]      With regard to the introduction of extrinsic information that Defendant's 1999 trial attorney was incompetent and that was the reason for a new trial, the State argues that once the jury knew of the first trial, learning the reason a second trial was required did not result in prejudice.  Finally, with regard to extrinsic information that Defendant had served ten years in prison at the time of

the trial, the State argues that it overcame the presumption of prejudice through the introduction of overwhelming evidence of Defendant's guilt.

[¶49.] The clearly erroneous standard is used when reviewing a trial court's factual findings on juror misconduct. *Wilkins*, 536 NW2d at 99 (citing Shamburger v. Behrens, 418 NW2d 299, 303 (SD 1988)). We will reverse a trial court's finding of fact under the clearly erroneous standard only if after reviewing all of the evidence we are left with a definite and firm conviction that a mistake has been made. *Id.* (quoting State v. Almond, 511 NW2d 572, 574 (SD 1994)). "We will uphold the trial court's resolution of the facts unless, upon our viewing of the evidence in a light most favorable to the trial court's finding, we are convinced the finding was clearly erroneous under this definition." *Id.*

[¶50.] We use the abuse of discretion standard of review to determine whether a trial court erred in its denial of a motion for new trial based upon a claim of juror misconduct. State v. Johnson, 2001 SD 80, ¶9, 630 NW2d 79, 82 (citing State v. Alidani, 2000 SD 52, ¶9, 609 NW2d 152, 155). In criminal prosecutions, a rebuttable presumption of prejudice exists when extrinsic information is introduced into jury deliberations. *Id.* ¶10, 630 NW2d at 82 (citing *Wilkins*, 536 NW2d at 99). The trial court is precluded from inquiring into the subjective effect the extrinsic information had upon a juror. *Wilkins*, 536 NW2d at 99 (quoting Buchholz v. State, 366 NW2d 834, 838 (SD 1985). The trial court is permitted, however, to question jurors to determine whether the extrinsic information had no effect upon them. *Id.* at 100 (citing Port Terminal & Warehousing Co. v. John S. James Co., 92 FRD 100, 109 (SDGa 1981)). We review the matter while recognizing that the trial court had

the advantage of being present during the trial and was in the best position to determine whether extrinsic material prejudiced the jury. *Id.* (quoting *Shamburger*, 418 NW2d at 302-3)).

[¶51.]    The rebuttable presumption of prejudice in a criminal trial may be overcome in one of three ways. First, it may be overcome "[b]y showing the information was harmless in view of all the evidence of guilt." *Wilkins*, 536 NW2d at 99-100 (citing Sher v. Stoughton, 666 F2d 791, 793 (2dCir 1981)). Second, it may be overcome if the trial court determines that "there was no significant possibility that the defendant was prejudiced." *Id.* at 100. (citing United States v. McKinney, 429 F2d 1019 (5thCir 1970), cert. denied, 401 US 922, 91 SCt 910, 27 LEd2d 825 (1971)). Finally, under the third option the rebuttable presumption may be overcome by a "showing that the nature of the extra-record evidence could not have had or had a minimal effect upon the jury." *Id.* (citing United States ex rel. Owen v. McMann, 435 F2d 813 (2ndCir 1970)). Only under the third option does "the trial judge . . . invoke an objective standard, that of ascertaining 'the likelihood that the influence would have upon a typical juror.'" *Id.* (quoting *Buchholz*, 366 NW2d at 840).

[¶52.]    Defendant argues the trial court erred when it did not find on the record that Juror "N," the truck dispatcher, said in a loud voice at the start of deliberations that Defendant had been in prison for the past ten years. However, only Juror "C" testified that Juror "N" made this comment. Juror "N" testified that he did not recall making the comment or anyone else doing so. Juror "N" also

testified that he was not aware Defendant had been in prison or jail for ten years at the time of the deliberations.

[¶53.] Even if this Court were to find the trial court erred when it failed to make a finding of fact specific to Juror "N," such an error is not prejudicial. The trial court found extrinsic information regarding the ten years Defendant had been in prison prior to trial came before the jury. It then addressed the rebuttable presumption of prejudice. The source of the extrinsic information was not necessary to determining whether Defendant was prejudiced by it.

[¶54.] The trial court found that extrinsic information that Defendant had spent the past ten years in prison and that his first trial attorney provided incompetent representation came before the jury. It then addressed the presumption of prejudice. The trial court's first rationale for overcoming the rebuttable presumption of prejudice was that there was substantial evidence of guilt presented such that the extrinsic information was harmless. As the trial court noted in its oral decision, this was a five-day trial during which the victims, Detective Fox, Horan, and Dr. Strong were vigorously cross-examined. There was substantial evidence of Defendant's guilt, although some of it was contradicted during cross-examination. The jury was able to hear all the inconsistencies in the testimony, yet still returned a verdict of guilty.

[¶55.] The trial court's second rationale for concluding that the presumed prejudice was overcome by the State was that there was no significant possibility that Defendant was prejudiced by the jury learning the reason for the second trial

was the incompetence of his first attorney. The trial court also noted that it gave a limiting instruction to the jury, Instruction No. 28, which provided:

> You have heard evidence that there was a previous trial of the defendant for the crimes charged here. Keep in mind however that you must decide this case solely on the evidence presented to you in this trial. You must not consider the fact of a previous trial in any way when you decide if the government has proved beyond a reasonable doubt its case against the defendant here.

It did so after references in cross-examination to prior proceedings and transcripts at the second trial made it apparent to the jury that a previous trial had taken place. The trial court concluded the State overcame the rebuttable presumption of prejudice in light of Instruction No. 28, and the complete lack of any evidence presented at the hearing that the jury speculated on the outcome or the significance of the prior trial.[7]

[¶56.] We do not find the trial court abused its discretion when it found that the State carried its burden on the rebuttable presumption of prejudice. The trial court was able to observe the witnesses and hear all the testimony live. We will not second guess on appeal the trial court's conclusion that there was substantial evidence in the record sufficient to overcome the presumption of prejudice.

[¶57.] Affirmed.

[¶58.] ZINTER, MEIERHENRY, and SEVERSON, Justices, and, HOUWMAN, Circuit Court Judge, concur.

---

7.  Defendant's argument that the trial court erred by not employing the objective juror standard is also without merit. The trial court did not utilize the third option under *Wilkins*. *See supra* ¶51. Hence, the objective juror standard was not required.

#24986

[¶59.]     HOUWMAN, Circuit Court Judge, sitting for KONENKAMP, Justice, disqualified.